NAOMI CHUNG (CSBN 283743)
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 746-9080
Fax: (415) 484-7054
naomichung@defenseaid.com

BRENDAN HICKEY (CSBN 261794)
Pier 9, Suite 100
San Francisco, CA 94111
Telephone: (415) 494-8444
Fax: 415-735-3544
brendan@defender-services.com

Attorneys for Defendant
GREGORY BELCHER

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR16-0211-LHK |
| Plaintiff, | **DEFENDANT GREGORY BELCHER'S MOTION FOR JUDGMENT OF ACQUITTAL AND/OR NEW TRIAL** |
| v. | |
| GREGORY BELCHER, | |
| Defendant. | |

1

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...........................................................................................5

II.     STATEMENT OF FACTS AS TO COUNT 16 ........................................7

III.    RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL .................8

        A.      Legal Standard ...........................................................................8

        B.      Elements of Count 16 – 18 U.S.C. § 1035 ..........................10

                i.      *The govt failed to prove "materiality"* ...............11

                        (1)     What false statement was made?.................12

                        (2)     What decision was Cigna trying to make?..............12

                        (3)     Was the false statement material to Cigna's decision? ...........12

                        (4)     The government's evidence was legally insufficient to prove "materiality" beyond a reasonable doubt ...................15

                ii.     *The government failed to prove Dr. Belcher's conduct "willfully"* ........18

                        (1)     Willfully defined ..............................18

                        (2)     Dr. Belcher testified that he did not think it was unlawful to change the date of service ...................19

                        (3)     The government admitted during trial that Dr. Belcher lacked the necessary *mens rea* required by § 1035 ........20

                        (4)     The jury acquitted Dr. Belcher on all other counts, including Counts 7 and 8 which charged essentially the same conduct as Count 16.......................................22

                        (5)     The circumstances were not designed to unjustly enrich Dr. Belcher. ...............................23

                        (6)     The conviction of Count 16 must be reversed because there is at least a reasonable inference that Dr. Belcher did not possess criminal intent ..................25

IV.     RULE 33 MOTION FOR NEW TRIAL..................................................26

        A.      Legal Standard ...........................................................................26

        B.      Argument ...................................................................................27

                i.      *All Rule 29 arguments are realleged* .....................27

                ii.     *The Court should grant a new trial of Count 16 because the instructions for § 1035 was too ambiguous to guide the jury in adjudicating the offense.* ...................27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

   ***iii.***   **The Court should grant a new trial because the source spreadsheets were admitted in violation of Dr. Belcher's constitutional rights.** ................................................28

V.    CONCLUSION ....................................................................................30

## **TABLE OF AUTHORITIES**

### **FEDERAL CASES**

*Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004) .................................................8

*Newman v. Metrish*, 543 F.3d 793 (6th Cir. 2008) ...........................................9

*O'Laughlin v. O'Brien*, 568 F.3d 287 (1st Cir. 2009) .......................................9

*United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992) ..................................26

*United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992) .....................................9

*United States v. Cassese*, 290 F.Supp. 2d 443 (S.D.N.Y. 2003)........................8

*United States v. Crawford, 541* U.S. 36 (2004) .........................................29, 30

*United States v. Delgado,* 357 F.3d 1061 (9th Cir. 2004).................................9

*United States v. Glenn*, 312 F.3d 58 (2d Cir. 2002).........................................9

*United States v. Kellington,* 217 F.3d 1084 (9th Cir. 2000)............................26

*United States v. Leon*, 534 F.2d 667 (6th Cir. 1976) ........................................9

*United States v. Martinez*, 54 F.3d 1040 (2d Cir. 1995) ...................................9

*United States v. Penagos*, 823 F.2d 346 (9th Cir. 1987)...................................9

*United States v. Rush*, 749 F.2d 1369 (9th Cir. 1984) ....................................26

*United States v. Stone*, 748 F.2d 361 (6th Cir. 1984)........................................9

*United States v. Tory*, 52 F.3d 207 (9th Cir. 1995).........................................26

*United States v. Udechukwu*, 11 F.3d 1101 (1st Cir. 1993)............................26

*United States v. Wiseman*, 25 F.3d 862 (9th Cir. 1994)....................................9

*United States. v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) ........................passim

1

## FEDERAL STATUTES

2   18 U.S.C. § 1035 ............................................................................................................passim

3   18 U.S.C. § 1347 .......................................................................................................... 15, 16

4   *Bryan v. United States*, 524 U.S. 184 (1998) ................................................................ 19

5   *Cheek v. United States*, 498 U.S. 192 (1991) ................................................................ 19

6   *Dennis v. United States*, 341 U.S. 494 (1951) .............................................................. 18

7   *Kungys v. United States*, 485 U.S. 759 (1988) .............................................................. 11

8   *Ratzlaf v. United States*, 510 U.S. 135 (1994) ............................................................. 19

9   *United States v. Blood*, 806 F.2d 1218 (4th Cir. 1986) ................................................ 21

10  *United States v. Gaudin*, 515 U.S. 506 (1995) ........................................................ 11, 12

11  *United States v. Kattar*, 840 F.2d 118 (1988) .............................................................. 21

12  *United States v. Whab*, 355 F.3d 155 (2d Cir. 2004), *cert denied*, 541 U.S. 1004 ....... 11

13

## FEDERAL RULES

14

15  Fed. R. Crim. P. 29 ......................................................................................................passim

16  Fed. R. Crim. P. 33 .............................................................................................. 5, 6, 26, 27

17

##  CONSTITUTIONAL PROVISIONS

18  First Amendment ...........................................................................................................passim

19  Sixth Amendment ........................................................................................................... 29

20

21

22

23

24

25

26

27

28

# I.     INTRODUCTION

Dr. Gregory Belcher hereby moves the court, pursuant to Federal Rules of Criminal Procedure 29 and 33, to direct a verdict of not guilty or grant him a new trial as to Count 16 – the lone count of conviction at trial – which charged him with making a false statement in relation to a health care matter in violation of 18 U.S.C. § 1035.

The evidence at trial was legally insufficient to support a conviction under Rule 29 because no reasonable trier of fact could conclude, based on the evidence presented at trial, that Dr. Belcher's false statement was "material" or that he acted "willfully" as those terms are properly legally defined.  The false statement – that Mrs. Habibi was seen on November 23rd, 2013 when in truth she was seen on November 25 – is immaterial because Cigna, Mrs. Habibi's insurer and the person to whom Dr. Belcher's statement was directed, had a contractual legal obligation to pay the claim regardless of whether services were provided on November 23 or November 25.  Changing the date did not affect Cigna's obligation to pay the claim, did not cause any economic injury to Cigna or unjust enrichment to Dr. Belcher, and therefore falls short of the statutory and First Amendment constitutional requirements for establishing the materiality necessary to support a false statement conviction.  The evidence of willfulness was also legally insufficient: Dr. Belcher testified credibly that he had no "bad purpose" and did not believe his conduct to be improper, the government agreed with that testimony on the record in front of the jury, and the jury acquitted Dr. Belcher on the other 13 counts (strongly indicating they believed his testimony to be credible).  The evidence was overwhelming that Dr. Belcher operated his therapy practice in a way that was designed to provide outstanding patient care to patients with serious medical problems and not to maximize revenue (or even earn profits at all), and there was no evidence to support a "bad purpose" for changing the date on the claim for Ms. Habibi (since he was entitled to payment for those services).  In view of these facts, no reasonable juror could

conclude that materiality and willfulness was proven beyond a reasonable doubt, and the court should direct a verdict of guilty as to Count 16.

Dr. Belcher's conviction should be overturned, and a new trial granted on several grounds.  First, the evidence was insufficient as laid out in the Rule 29 motion for a directed verdict, resulting in a miscarriage of justice.  Second, the jury was not properly instructed as to the element of "materiality" as to the false statement charges (including Count 16) – they were not provided *any* guidance as to the meaning of that term in the context of a false statement charge.  Third, the conviction violated Dr. Belcher's his First Amendment right to freedom of speech by criminalizing false speech without proof of the constitutionally required component of economic (or other) injury.  And fourth and finally, the conviction was based on evidence in the form of health insurance company spreadsheets that were introduced via false affidavits provided by the United States in conjunction with health insurers which the United States knew were false at the time they were presented to the court.  Those affidavits falsely represented that the insurers' spreadsheets were produced "in the ordinary course of business" when in truth (as the insurers admitted on the witness stand) the spreadsheets were prepared in response to Grand Jury subpoenas in preparation for litigation and not in the ordinary course of business.  Because the government (which served the subpoenas and requested production of the spreadsheets and affidavits) knew the affidavits were false at the time they were submitted to the court, Dr. Belcher's constitutional confrontation and due process rights were violated, and he should be granted a new trial.

The arguments outlined in the Rule 29 motion are realleged in the Rule 33 motion but applying a different legal standard.

//

//

## II.      STATEMENT OF FACTS AS TO COUNT 16

On December 14, 2016, the jury acquitted Dr. Belcher of all one count of conspiracy to commit health care fraud (Count 1), four counts of health care fraud (Counts 7-10), one count of making false statements relating to health care matters (Count 17), one count of conspiracy to commit money laundering (Count 18) and six counts of money laundering (Counts 19-24).

Dr. Belcher was found guilty of one count of making false statements relating to health care matters, as to the submission on or about November 26, 2013, to Cigna of claimed care beneficiary Mastenah Habibi, in violation of Title 18, United States Code, Section 1035, as charged in Count 16 of the Indictment.

Count 16 refers to claims Dr. Belcher *submitted on or about November 26, 2013,* to Cigna, for therapy services provided to Mrs. Habibi.   There were only two therapy claims submitted by Dr. Belcher on November 26, 2013.  He represented to Cigna that Mrs. Habibi had received one therapy session on November 23 and the other session on November 25.  Cigna paid Dr. Belcher $251.09 for each therapy session.

According to the Google calendar Mrs. Habibi received both therapy sessions on November 25, 2013.  *See* Exhibit 1 – Google calendar at 44-153.  Mrs. Habibi's testimony confirmed that she often received two therapy sessions on the same day.  *See* Exhibit 2 – Mastenah Habibi Partial Transcript.  There was no testimony that Mrs. Habibi did not actually receive two therapy sessions on November 25, 2013.

Dr. Belcher also testified at trial at some point he realized that his physical therapist, Abigail Cabral, was scheduling patients for two therapy sessions in one day.   Usually one session would be with a physical therapist and the other session would be with a massage therapist.  He testified that when patients received two therapy treatments on the same day, he sometimes altered the dates of service by one or two days to avoid having the insurers' claims processing

system erroneously deny the second session as a duplicate without realizing that the patient had actually received two sessions, not one.  He testified that a billing professional had advised that this splitting the dates of service in this way was an acceptable fix and therefore he did not realize it was improper or that he was breaking the law.

### III.    RULE 29 MOTION FOR JUDGMENT OF ACQUITTAL

#### A.  **Legal Standard**

The Due Process Clause "requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt."  *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004).  To ensure that a defendant is convicted in accordance with due process principals, Federal Rule of Criminal Procedure 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29.

Rule 29(c)(1) expressly provides that a defendant may move for judgment of acquittal even after the jury has returned a guilty verdict on one or more counts of the indictment.  Fed. R. Crim. P. 29(c)(1).  And where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt on each and every element of the charged offense, a judgment of acquittal is required.  *Id.*; *see also United States v. Cassese*, 290 F.Supp. 2d 443 (S.D.N.Y. 2003) (granting motion for judgment of acquittal following a guilty verdict by the jury and after the court had twice before denied defendant's motions for judgment of acquittal).

Although the trial court must view the evidence in the light most favorable to the government when considering a motion under Rule 29, **the government still bears the burden of proving a defendant's guilt beyond a reasonable doubt.**  Furthermore, "where a fact to be proved is also an element of the offense … which is usually established on by inference-it is not

enough that the inferences in the government's favor are permissible." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995); *see also, United States v. Bishop*, 959 F.2d 820, 831 (9th Cir. 1992); *United States v. Penagos*, 823 F.2d 346, 349 (9th Cir. 1987); *accord*, *United States v. Wiseman*, 25 F.3d 862, 866-67 (9th Cir. 1994).   A trial court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez, supra*, 54 F.3d at 1043.   Indeed, while "circumstantial evidence alone can support a conviction, there are times that it amounts to only reasonable speculation and not to sufficient evidence." *Newman v. Metrish*, 543 F.3d 793, 796 (6th Cir. 2008); *see also O'Laughlin v. O'Brien*, 568 F.3d 287, 301 (1st Cir. 2009) (noting that there are "some limits" to the probative value of circumstantial evidence, and that a reviewing court should not give credence to evidentiary interpretations that are "unreasonable, insupportable, or overly speculative.").

It follows then that when "the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then '**a reasonable jury must necessarily entertain reasonable doubt**.'" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (emphasis added) (citation omitted)*; United States v. Delgado,* 357 F.3d 1061, 1068 (9th Cir. 2004) (citation omitted); *United States v. Bishop*, 959 F.2d at 831 ("When a defendant's behavior is entirely consistent with innocence, the government must 'produce evidence that would allow a rational jury to conclude beyond a reasonable doubt that the defendant [in fact engaged in criminal conduct].") (citation omitted); *see also, United States v. Leon*, 534 F.2d 667, 677 (6th Cir. 1976), overruled on other grounds, *United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984).

//

//

**B.  Elements of Count 16 – 18 U.S.C. § 1035**

At end of the closing arguments, the Court instructed the jury that in order for Dr. Belcher to be found guilty of making false statements relating to health care matters, the government must prove beyond a reasonable doubt:

First, that the defendant made or used a *materially* false writing or document;

Second, that the defendant knew the *materially* false writing or document contained a *materially* false, fictitious, or fraudulent statement or entry;

Third, in connection with the delivery of or payment for health care benefits, items, or services, involving a health care benefit program; and

Fourth, that the defendant did so knowingly and *willfully*; that is, the defendant acted deliberately and with the knowledge both that the statement was untrue and that his or her conduct was unlawful.

Dkt 280 at p. 33 (emphasis added).

According to Count 16, Dr. Belcher misrepresented that Mrs. Habibi had received therapy on November 23, 2013, when she was actually treated two days later, on November 25. However, in a decision affirmed by the U.S. Supreme Court, the Ninth Circuit explained that "**falsity alone is not enough**" to sustain a conviction under 18 U.S.C. § 1035.  *United States. v. Alvarez*, 617 F.3d 1198, 1212 (9th Cir. 2010), aff'd, 132 S.Ct. 2537 (2012) (emphasis added). This is because § 1035 and similar federal laws criminalizing false statements "require at a minimum that the misrepresentation be **willful**, **material**, **and uttered under circumstances in which the misrepresentation is designed to cause injury**."  *Id.* at 1211-1212 (emphasis added).

In *Alvarez*, the Ninth Circuit held that the Stolen Valor Act violated the First Amendment because it "was unconstitutionally applied to make a criminal out of a man who was proven to be nothing more than a liar, without more."  *Alvarez*, *supra*, 617 F.3d at 1217.  The Ninth Circuit explained that while "Alvarez's lie, deliberate and despicable as it may have been, did not escape notice and correction in the marketplace" and "[t]he preferred First Amendment

10

remedy of 'more speech' thus was available to repair any harm." *Id.* at 1216-1217 (citations omitted).   The Court undeniably recognizes that the defendant deliberately made a false statement, but focuses on the fact that the First Amendment requires more – a bona fide injury, that could not be easily repaired.   In other words, as with other statutes that criminalize factual speech, the falsity in a prosecution under § 1035 must be "designed to cause an injury" or "likely to cause a bona fide harm" in order to avoid infringing on the First Amendment free speech rights of the defendant.  *Id.* at 1211, 1216-1217.

This Court should not relieve the government of its burden of proving beyond a reasonable doubt that misrepresenting the date on which Mrs. Habibi received therapy was "willful", "material", and "designed to cause injury."  *Id.*

### i.   The government failed to prove "materiality"

Materiality is an essential element to establishing a violation under 18 U.S.C. § 1035. The jury was instructed that the government must prove beyond a reasonable doubt that the "defendant used a **materially** false writing or document" and "defendant knew the **materially** false writing or document contained a **materially** false, fictitious, or fraudulent statement".  Dkt 280 at p. 33 (emphasis added).  The jury instruction, however, did not offer any guidance on how to define "materially" for purposes of § 1035.[1]

For a statement to satisfy the materiality element § 1035, "[t]he statement must have 'a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  *United States v. Gaudin*, 515 U.S. 506, 509 (1995) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988); *see United States v. Whab*, 355 F.3d 155, 163 (2d Cir. 2004), *cert denied*, 541 U.S. 1004.  In *Gaudin*, the Supreme Court explained that

---

[1] The jury instruction for health care fraud, 18 U.S.C. § 1347, included a definition for "material fact" in the context of a health care fraud charge.  Dkt. 280 at p. 32.  "A fact is 'material' if it has the capacity or natural tendency to influence a person's decision."  *Id.*  This definition, however, was not included in the

"[d]eciding whether a statement is 'material' requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" 515 U.S. at 512.  The ultimate question "'whether the statement was material to the decision,' requires applying the legal standard of materiality (quoted above) to the historical facts." *Id.*

### (1) **What false statement was made?**

Dr. Belcher represented to Cigna that Mrs. Habibi received therapy treatment on November 23, 2013, when she was actually treated two days later, on November 25.  The claimed services were actually provided to Mrs. Habibi, so the only part of the claim that was false is the date of service, which was off by two days.

### (2) **What decision was Cigna trying to make?**

Cigna had to decide whether it would reimburse Dr. Belcher for the therapy treatment Mrs. Habibi received on November 23, 2013.  Cigna ultimately paid Dr. Belcher $251.09 for that one therapy session.

### (3) **Was the false statement material to Cigna's decision?**

The best way to easily evaluate the materiality of a statement is to remove the false statement and replace it with the truth.  If the decisionmaker would have behaved differently had the true facts been known, then false statement was material.  However, if changing out the false statement for the truth would have had no impact on the decisionmaker, then it is not material.

There is no evidence whatsoever that Cigna would have processed the claim any differently – and no evidence that they would not have paid it – if they had received a claim with the correct date of November 25 instead of November 23.  In fact, Cigna has a binding

jury instruction for false statements relating to health care matters.

contractual legal obligation with its contracted providers and beneficiaries to pay *medically necessary* services that constitute a *covered benefit*.  Dr. Belcher is a contracted provider with Cigna and Mrs. Habibi is a beneficiary of one of Cigna's many health insurance plans. Accordingly, Cigna has a preexisting legal obligation to reimburse Dr. Belcher for any covered and medically necessary services actually provided to Mrs. Habibi.  The change in date of service by two days does not remove or alter that legal obligation because, as explained below, there is no evidence of any changes in medical necessity or policy coverage for Mrs. Habibi between November 23 and November 25.  The claim would therefore have been paid had it been submitted with the correct date of November 25.  Because the misrepresented date did not affect Cigna's obligation to pay the claim and thus resulted (and was intended to result in) no unjust enrichment of Dr. Belcher, the false statement was not material.  It is, as the government argued in their opening statement "all about the money."   Exhibit 3 – Government's Partial Opening Statement Transcript.

First, the specific date on which Mrs. Habibi received therapy is irrelevant to Cigna's determination of whether the therapy was *medically necessary*.  The evidence shows that Cigna covered a total of 16 therapy sessions for Mrs. Habibi during November 2013, the first covered session occurring on November 1 and the last covered session occurring on November 25.  Cigna therefore must have determined that therapy was medically necessary for Mrs. Habibi the entire month of November.  Furthermore, there is absolutely no evidence suggesting that there was a change in Mrs. Habibi's diagnosis, symptoms, or physical condition during this period that would have influenced Cigna's medical necessity determination.  There is simply no evidence that therapy would have been considered medically necessary on November 23, but not on November 25.

Second, there is no evidence of any change in Mrs. Habibi's insurance coverage between November 23 and November 25. In fact, the evidence shows that Cigna covered all of the therapy Mrs. Habibi received throughout the month of November 2013. There is absolutely no evidence that Mrs. Habibi's switched insurers, plans, or hit coverage limits in November 2013. The amount of money Cigna paid Dr. Belcher for therapy provided to Mrs. Habibi on November 23 to November 25 were identical, thereby proving that there was no change in Mrs. Habibi's plan between those two days which would have affected Cigna's reimbursement.

Thus, if Dr. Belcher had simply used the correct date of November 25, instead of November 23, Cigna would have had a legal contractual obligation to pay the claim and would have, in fact, paid it just as they did under the incorrect November 23 date. And because Mrs. Habibi actually received the therapy referenced in Count 16, Dr. Belcher was not unjustly enriched by Cigna's decision to reimburse his claim. Thus, misrepresenting the date of service by two days was not "made under circumstances designed to cause injury." *Alvarez*, *supra*, 617 F.3d at 1211.

The Ninth Circuit has recognized that the First Amendment demands that a false statement which serves as the basis of a criminal conviction must be "designed to cause injury" or "likely to cause a bona fide harm". *Alvarez, supra, 617 F.3d* at 1211, 1216-1217. In Dr. Belcher's case, the jury was not provided any guidance on the correct standard for materiality under § 1035 and was not instructed at all as to the constitutional requirement that there be some economic or other injury in order to convict someone of a crime for making false factual speech. If the reasoning in *Alvarez* is applied here, the jury cannot convict Dr. Belcher simply because he "lied", i.e. he deliberately submitted a false date of service. There must be more. The jury must have found that Dr. Belcher's conduct was "designed to cause an injury". The evidence, however, indicates that Mrs. Habibi received a medically necessary therapy session that was

covered by her policy with Cigna. Consequently, Cigna had a contractual legal obligation with Dr. Belcher and Mrs. Habibi to pay the claim. Dr. Belcher was paid $259.01 for the therapy session Mrs. Habibi received. He was not unjustly enriched, nor was Cigna harmed.

This leaves one of two possibilities: either § 1035 is constitutionally overbroad as applied to Dr. Belcher and criminalizes false speech not resulting in injury, or "materiality" under § 1035 requires some intended or actual injury and the evidence was legally insufficient to prove that element beyond a reasonable doubt.

### (4) The government's evidence was legally insufficient to prove "materiality" beyond a reasonable doubt

At trial, the government – perhaps aware that there was no evidence of injury or unjust enrichment – called representative witnesses from all five insurance companies and had them testify, in substance, that their company would deny any claim with a false statement in it, regardless of how minor the falsity was. This is not proof of materiality – it is an attempt to make an end-run around the materiality requirement by arguing that *any* false statement would result in non-payment of a claim, and thus that any false statement is automatically made material by Cigna's internal policy. This attempt to bypass the materiality requirement not only violated Dr. Belcher's right to proof beyond a reasonable doubt as to each element, it also misses the point: the jury instructions for 18 U.S.C. § 1347 clearly state that "[i]t does not matter whether the decision-maker actually relied on the statement". Dkt 280 at 32:3. What matters is whether Cigna would have been obligated to pay the claim had it been truthfully stated, and thus whether the falsity had any tendency to cause economic injury.

This mischaracterization of the materiality requirement is exacerbated because the jury instruction for 18 U.S.C. § 1035 failed to include a definition or even guidance on how to define "materially". In contrast, the jury instruction for 18 U.S.C. § 1347, health care fraud, specifically

defined "material fact".   However, it is unlikely that the jury relied on the "material fact" definition included in the health care fraud instruction because definitions of terms that were explicitly to be applied to both § 1347 and § 1035 were given their own separate instructions.   For example, "willfully" was separately defined in jury instruction no. 5.5 and "knowingly" was separately defined in jury instruction no. 5.6.   Both instruction no. 5.5 and 5.6 state that the definition applies to the health care fraud and making false statements related to health care matters instructions.   Dkt 280 at p. 18-19.   There was no such separate instruction defining the term "materially" or "material fact".   Instead the only definition referred to "material fact", not "materially", and was included *within* the health care fraud instruction, but not in the false statements instruction.   Dkt. 280 at 32:1-4.   A rational juror would conclude from this that the court meant what it said: that the "willfully" and "knowingly" instructions in 5.5 and 5.6 applied to both fraud and false statement charges, but the other terms within each instruction applied to that instruction alone.   The difference in verdict between Count 16 on one hand and Counts 7 and 8 on the other, is likely attributable to the fact that the jury instruction for health care fraud specifically defined what constituted a "material fact"; whereas, the jury instruction for false statements relating to health care matters did not include any definition or even guidance on how to define "materially".   The government's efforts to escape the materiality requirement, combined with the absence of a specific definition for "materially", left the jury with no way to properly understand and apply the law.

While the government elicited testimony about dates of service in health care claims, none of it was specific to Mrs. Habibi's policy with Cigna or to the specific claim referenced in Count 16.   For example, Cigna's representative Tammy Kahler, testified about how the accuracy of the "date of service" and the "provider's name" are important to keep an accurate record of the patient's health.   *See* Exhibit 4 – Tammy Kahler Partial Transcript at 182:14-21; 186:13-16.

While keeping an accurate record of the patient's health is undeniably important, there is no evidence that it has anything to do with Cigna's reimbursement decision or that any injury was suffered due to record-keeping deficiencies.

At most, Ms. Kahler testified that whether a bill indicated that two physical therapy sessions were provided on the same day as opposed to over a couple of days, "could impact a patient because a lot of [Cigna's] policies have limits on the amount of visits that [the patient] can have for physical therapy, so if it's billed across multiple dates, they could exhaust their benefit way before their time." *See* Exhibit 4 at 185:9-18. The key word here is" could" – the evidence is quite clear that Mrs. Habibi did not hit her policy limits between November 23 and November 25: Cigna covered 11 therapy sessions Mrs. Habibi received in October 2013, 16 therapy sessions in November, and 15 sessions in December. Records show that Cigna continued to cover Mrs. Habibi's therapy sessions well into 2014. There was no evidence suggesting that Ms. Kahler had even reviewed Mrs. Habibi's plan to determine whether her hypothetical applied in this case. Indeed, Mrs. Habibi did receive two therapy sessions on November 25, from two different licensed therapists – one physical therapist, and one massage therapist. Thus, even though the date of service for one of the two sessions inaccurate, the reality is that Mrs. Habibi was actually provided two separate sessions of therapy for which Dr. Belcher sought reimbursement. And ultimately, **there was no testimony whatsoever that Mrs. Habibi's policy specifically did not cover two therapy sessions in one day**.

Ms. Kahler was not the only witness who made general statements about date of service. Julia Haskins, Anthem's representative, testified that if a provider submitted a claim with the wrong date, Anthem would simply tell the provider to resubmit the claim with the correct date and they would the claim would be paid. Kathy Richer, Aetna's representative, testified that dates of service can be relevant because patients may have switched insurers or policies on a

particular date resulting in a change in their deductible; however, there is absolutely no evidence that this was an issue for Mrs. Habibi.  It is simply inapplicable to Mrs. Habibi's circumstances. Jacob Kearny, Optum's representative, testified that the date of service is not a variable in determining amount paid to the provider.   Alex Kondratenko, Blue Shield California's representative Alex Kondratenko testified that there are largely four variables pertinent to reimbursement determinations – coverage, whether the provider is a licensed professional, whether the service was medically necessary, and finally whether the service was actually provided.[2]  None of this indicates that having a date of service off by two days – where there is no evidence of changes to medical necessity, applicable insurance policy, or coverage limits – materially affects the insurer's obligation to pay the claim.

### ii.   The government failed to prove Dr. Belcher's conduct "willfully"

### (1) <u>Willfully defined</u>

Congress expressly limited application of § 1035 to false statements made "willfully", imposing a *mens rea* requirement beyond its condition that the falsehood also be made "knowingly".  "The existence of a *mens rea* is the rule of, rather than exception to, the principles of Anglo-American criminal jurisprudence."  *Dennis v. United States*, 341 U.S. 494, 500 (1951) (citation omitted).

Making a false statement "willfully" means that the speaker "acted with bad purpose and with knowledge that the conduct was unlawful".  Dkt 280.  This "willfully" test requires either precise knowledge of the statute prohibiting the conduct, or general knowledge of the illegality of the conduct, neither of which was ever shown at trial, and both of which were implicitly rejected by the jury's acquittal of Dr. Belcher on all the health care fraud counts

---

[2] Defense counsel ordered transcripts for the insurance representatives but did not receive them in time to verify the exact quotes and provide citations. Instead, counsel relied on notes from trial.

(Counts 7-10), as well as the one other false statement count (Count 17).  *See Cheek v. United States*, 498 U.S. 192, 200-01 (1991) ("willfully" requires proof of specific knowledge that the conduct was violating a specific legal obligation); *Ratzlaf v. United States*, 510 U.S. 135, 146 (1994) ("willfully" requires proof of knowledge of the law being violated); *Bryan v. United States*, 524 U.S. 184, 196 (1998) (general knowledge of illegality of the conduct is required by the "willfully" condition).

### (2) **Dr. Belcher testified that he did not think it was unlawful to change the date of service**

Dr. Belcher's *mens rea* or lack thereof can only be proven by circumstantial evidence. The most probative piece of evidence at trial was Dr. Belcher's testimony.  Dr. Belcher testified that he did not think it was improper to change the date of service, because he is a physician, not a medical biller, and was advised by a professional biller that splitting the dates of services was an acceptable fix to avoid confusion and processing errors.  Dr. Belcher explained that he was simply trying to get reimbursed for services that were actually provided to his patients.  He repeatedly testified that he did not think his conduct was "unlawful" and that he did not have a "bad purpose".

| | |
|---|---|
| Mr. Delahunty: | Okay.  I – let's – I just want to ask you – it sounds like you're saying no, but tell me if I'm wrong.  You – did you think it was improper to put the different service date, yes or no? |
| **Dr. Belcher:** | **No.** |
| Mr. Delahunty: | Is that a no? |
| Dr. Belcher: | That's a no. |
| Mr. Delahunty: | You thought it was okay? |
| **Dr. Belcher:** | **Right.  Because that's how I was taught.** |

| | |
|---|---|
| Mr. Delahunty: | I understand.  We've covered that several times. |
| Dr. Belcher: | Right. |
| …. | |
| Mr. Delahunty: | And now we've covered whether or not you thought it was appropriate to put the wrong date.  But you'd agree with me that you kept doing this, this splitting of – when someone was seen twice – you did it all through 2012; correct? |
| Dr. Belcher: | I'm not sure.  I'm not sure.  **But if I – if I did, I thought it was appropriate.** |

*See* Exhibit 5 – Dr. Belcher's Partial Transcript at p. 8-9.  (emphasis added).

Dr. Belcher's testimony was clear – he did not possess any unlawful intent or bad purpose when he put a different date of service on days when patients received two separate therapy sessions on one day.

### (3)  <u>The government admitted during trial that Dr. Belcher lacked the necessary *mens rea* required by § 1035</u>

The government admitted during trial that when Dr. Belcher submitted different dates of service, he did not believe his actions were unlawful.

| | |
|---|---|
| Mr. Delahunty: | Okay.  I want to know, did you bill, in 2012 and 2013 and 2014, when a patient was seen twice in one day, you would agree with me, you would split that and have the bill reflect as if they were seen on two days.  Didn't you do that? |
| Dr. Belcher: | Let's – |
| Mr. Delahunty: | Yes or no? |
| Dr. Belcher: | I can't specifically for each patient.  I mean, I can't tell you for which patients I did and which I didn't. |
| Mr. Delahunty: | I can give you some examples.  You'd agree with me it happened with Ms. Michael? |

1    Dr. Belcher:             It's fine.

2    Mr. Delahunty:           Do you want to go back and look at that?

3    **Dr. Belcher:           I didn't think it was a problem.**

4    **Mr. Delahunty:         Okay.  I agree with you, you didn't think it was a**
5                             **problem.**
                              What I want to know is whether or not you agree with
6                             me, you did that for years? In 2012, you saw the
7                             examples with Ms. Michael. In 2013, you saw the
                              examples with Ms. Michael.
8                             You did it with Ms. Habibi, correct, all through '12,
9                             '13, '14?  Do you want to look at the examples? Or
                              would you agree with me that you did it in those
10                            years?

11   **Dr. Belcher:           If I did, I felt it was necessary**.

12   *See* Exhibit 5 at p. 11 (emphasis added).   The government essentially testified during Dr.

13   Belcher's testimony that the government agreed that *Dr. Belcher did not believe it was a problem*

14   to change the date of service when patients received two sessions on the same day.   The

15   government stated, *sua sponte* and, on the record, that Dr. Belcher lacked criminal intent,

16   effectively stipulating to an essential fact of the case.  *See United States v. Kattar*, 840 F.2d 118,

17   130-131 (1988) (finding that "the assertions made by the government in a formal prosecution …

18   'establish the position of the United States and not merely the views of its agents who participate

19   therein.'") (citations omitted); *United States v. Blood*, 806 F.2d 1218, 1221 (4th Cir. 1986)

20   (statements by government attorney during voir dire would be binding against the government if

21   they had constituted a clear admission).  Given that there is no way to reconcile the government's

22   admission with a finding of criminal intent, no reasonable juror could find that Dr. Belcher

23   possessed the necessary *mens rea* to be convicted of § 1035 or that the evidence proved beyond a

24   reasonable doubt that Dr. Belcher's conduct was "willful."

**(4)** __The jury acquitted Dr. Belcher on all other counts, including__
__Counts 7 and 8 which charged essentially the same conduct as__
__Count 16.__

The jury's decision to acquit Dr. Belcher of all but one of the charges filed against him strongly suggests that they found his testimony highly credible.  It is particularly compelling that the jury acquitted Dr. Belcher of Counts 7 and 8 which charged him with *defrauding Cigna* by means of *materially false and fraudulent representations* regarding therapy services provided to *patient-beneficiary Mastenah Habibi* in violation of 18 U.S.C. 1347.  Dkt 52 at p. 10-11.  This is because circumstances in Count 16, to which this Rule 29 motion is targeted, are nearly identical to the circumstances in Counts 7 and 8, for which Dr. Belcher was acquitted.  The insurer on all three counts is Cigna.  The patient-beneficiary on all three counts is Mastenah Habibi.  All three counts involve claims submitted by Dr. Belcher for therapy services provided to Mrs. Habibi.  As discussed in this motion, Count 16 refers to the misrepresentation that Mrs. Habibi received therapy on November 23, 2013, when she was actually treated two days later on November 25.  As Dr. Belcher testified at trial, he split the two therapy sessions on different dates in order to avoid having the insurers' claims processing system erroneously deny the second session as a duplicate without realizing that the patient had actually received two sessions, not one.  Counts 7 and 8 also refer to the exact same circumstances of splitting the two therapy sessions into different dates.

For example, Count 7 refers to a claim submitted to Cigna for therapy provided to Mrs. Habibi on October 9, 2012.  According to Google calendar, however, Mrs. Habibi was not seen on October 9, but received two therapy sessions on October 10.  Exhibit 6 – Google calendar for Count 7.  Dr. Belcher billed Cigna for one therapy session on October 9 and one session on

October 10, even though Mrs. Habibi actually received both sessions on October 10.  Exhibit 7 – Spreadsheet for Count 7.[3]  This is exactly the same conduct at issue in Count 16.

Similarly, Count 8 refers to a claim submitted to Cigna for therapy provided to Mrs. Habibi on June 19, 2014.  According to Google calendar, Mrs. Habibi was not seen on June 19, but received two therapy sessions on June 20 (including the Boot Camp physical therapy session with Abigail Cabral).  Exhibit 8 - Google calendar for Count 8.  Dr. Belcher billed Cigna for one therapy session on June 19 and one session on June 20, even though Mrs. Habibi actually received both sessions on June 20.  Exhibit 9 – Spreadsheet for Count 8.[4]  Again, this is exactly the same conduct at issue in Count 16.

Given that Counts 7, 8, 16 all deal with the same conduct, same insurer, and same patient-beneficiary, the fact that the jury acquitted Dr. Belcher of Counts 7 and 8 (as well as the other health care fraud and false statements counts) is a strong indication that the jury found Dr. Belcher's testimony credible.

### (5) The circumstances were not designed to unjustly enrich Dr. Belcher.

None of the witnesses at trial testified that Dr. Belcher had a bad motive that was unlawful or driven by a desire for unjust enrichment.  By changing the date of service, he only wanted to make sure Cigna would not mistakenly process one of the two therapy sessions provided to Mrs. Habibi as a duplicate claim.  Generally, people break the law for financial gain, but here, there is no indication that Dr. Belcher's conduct was so that he could unjustly enrich himself.  Indeed, many witnesses for both the government and defense testified that Dr. Belcher's therapy practice did not appear to be motivated by money.

---

[3] Exhibit 7 is a print out of trial exhibit no. 119 filtered for Mastenah Habibi and October 9-10, 2012.
[4] Exhibit 7 is a print out of trial exhibit no. 119 filtered for Mastenah Habibi and June 19-20, 2014.

For example, Abigail Cabral, testified that she enjoyed working as a physical therapist at Dr. Belcher's clinic because she could provide treatment to patients without worrying about it being too expensive or that she was spending too much time with a patient.  *See* Exhibit 10 – Abigail Cabral Partial Transcript at p. 12.  In other words, Dr. Belcher did not "withhold anything" when it came to what was good for his patients.  *See* Exhibit 10 at p. 12.  She also testified that unlike other outpatient physical therapy centers, she was instructed to provide a full hour of one-on-one care to every patient.  *Id.*

| | |
|---|---|
| Mr. Hickey: | And so the fact that Dr. Belcher required you to spend one hour with each of his patients improved the quality of patient care, but cost him money? |
| Ms. Cabral: | Yes. |
| Mr. Hickey: | So if he had had twice as many patients, he would have made a lot more money from his physical therapy practice? |
| Ms. Cabral: | Correct. |

*See* Exhibit # - Abigail Cabral Transcript at p. 15.  Ms. Cabral also testified that a majority of Dr. Belcher's surgical patients were sent to other physical therapy providers, and the patients she treated at Dr. Belcher's clinic were those with the greatest medical needs and therefore were kept in-house for close supervision.  If Dr. Belcher was all about making the most money, he would not have referred out potential business to other therapists.

Similarly, Stacy Kinsel, a forensic accounting expert, testified that Dr. Belcher's therapy clinic continued to operate at a loss for nearly five years straight, corroborating Dr. Belcher and Ms. Cabral's testimony that his clinic was never about making money, but providing good quality of care and results for his patients.  The circumstances simply do not indicate any "bad purpose" that is a necessary component of willfulness.

**(6) <u>The conviction of Count 16 must be reversed because there is at least a reasonable inference that Dr. Belcher did not possess criminal intent</u>**

18 U.S.C. § 1035 requires that Dr. Belcher "willfully" submitted false statements relating to health care matters.  However, such criminal intent was not, and could not be, proven beyond a reasonable doubt with respect to Dr. Belcher.   Here, the circumstantial evidence at trial established at most, a choice between reasonable inferences of fact as to Dr. Belcher's motive for changing the dates of service, i.e. his *mens rea*.   This is particularly true in light of the jury's "not guilty" verdict as to Counts 7 and 8 which presented nearly identical circumstances as Count 16.

As previously explained in *supra* III. A., if this Court concludes that the circumstantial evidence establishes no more than a choice between reasonable inferences of fact, one tending to support guilt and the other tending to support innocence, the guilty verdict must be set aside. These principles are especially applicable in this case, where at least one of the critical elements of the charged offense, the *mens rea* element, can only be established only by circumstantial evidence.   The evidence produced at trial mentioned above *at the very least establishes a reasonable inference* that Dr. Belcher truly believed that changing the dates was an acceptable fix to avoid processing errors and confusion and that he did not willfully submit a false date of service to Cigna.  If such a reasonable inference could be made, then a reasonable jury must necessarily entertain reasonable doubt.

//

//

//

//

//

//

1

2

3

### IV.     RULE 33 MOTION FOR NEW TRIAL

#### A.  Legal Standard

Similar to a sufficiency of evidence standard in a Rule 29 motion, a district court may grant a new trial "in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984).  But a district court's power to grant a motion for a new trial based on insufficient evidence "is much broader than its power to grant a motion for judgment of acquittal." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992).  "The district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing may evaluate for itself the credibility of the witnesses." *United States v. Kellington,* 217 F.3d 1084, 1095 (9th Cir. 2000) (quoting *United States v. Alston*, 974 F.2d at 1211).  Even if there is an "abstract sufficiency of the evidence to sustain the verdict," a new trial may be granted where "the evidence preponderates sufficiently heavily against the verdict [such] that a serious miscarriage of justice may have occurred." *Kellington*, 217 F.3d at 1097 (internal citations omitted).

The district court may also consider evidentiary and procedural errors in weighing the motion for new trial.  *See, e.g., United States v. Tory*, 52 F.3d 207, 211 (9th Cir. 1995) (new trial granted on the basis of numerous erroneous evidentiary rulings); *United States v. Udechukwu*, 11 F.3d 1101, 1106 (1st Cir. 1993) (new trial required where the government failed to disclose exculpatory information it had in its possession).

Accordingly, in ruling on this Rule 33 motion, the Court should consider all of the sufficiency of the evidence arguments made in the Rule 29 motion *supra* – **but should do so unconstrained by the limitation of viewing it in the light most favorable to the government** – as well as the additional errors pointed to below.  Even if none of the issues raised in these motions individually persuades the Court, their cumulative impact on the defense was nothing

less than devastating.  And, a court may, on motion of a defendant, grant a new trial if required in the interests of justice.  Fed. R. Crim. P. 33.

### B.  Argument

#### i.    All Rule 29 arguments are realleged

All the arguments made in the Rule 29 motion *supra* are hereby realleged under the legal standard applicable to a Rule 33 motion for new trial.

#### ii.   The Court should grant a new trial of Count 16 because the instructions for § 1035 was too ambiguous to guide the jury in adjudicating the offense.

Jury Instruction No. 1035, after setting forth the elements of making a false statement relating to health care matters, failed to instruct the jury on how to define "materially".  As argued in the Rule 29 motion *supra*, III. B. i. (4), the Court's failure to provide the jury with any guidance on how to define the term "materially" as used in the instruction for 18 U.S.C. § 1035 constitutes instructional error that contributed to a verdict that is substantially inconsistent with the weight of the evidence and with the not guilty verdict given in all the other counts, particularly Counts 7 and 8.[5]

In order for § 1035 to be interpreted as constitutional, the materiality element must include evidence of economic or other injury.  *Alvarez*, *supra,* 617 F.3d at 1211, 1216-1217; *see also* Rule 29 motion *supra*, III. B. i.  The jury, however, was never instructed as to this requirement and cannot be expected to have properly applied it, resulting in a conviction for which the evidence is legally insufficient under any reading of the statute that passes First Amendment muster.

---

[5] To be fair, defense counsel does not recall lodging an objection on this specific issue during the jury instruction conference. The Court, however, has an independent legal obligation to properly instruct the jury.

If the court does not read the injury requirement into the statute's definition of materiality, then the, the conviction violated Dr. Belcher's his First Amendment right to freedom of speech by criminalizing false speech without proof of the constitutionally required component of economic or other injury.  *Alvarez*, *supra,* 617 F.3d at 1211, 1216-1217.  Dr. Belcher altered the date of service from November 25 to November 23 in order to get reimbursed for a therapy service that was actually provided to Mrs. Habibi; therefore, he was not trying to "cause harm" to Cigna.  Also, Cigna had a contractual obligation to ultimately pay the claim because it was a medically necessary treatment covered by Mrs. Habibi's policy; therefore, Cigna was not economically injured.

### iii.    The Court should grant a new trial because the source spreadsheets were admitted in violation of Dr. Belcher's constitutional rights.

Prior to trial, the government sought to introduce source spreadsheets prepared by the five insurers produced in response to grand jury subpoenas without a live witness.  Dkt 124.  The defense filed a motion *in limine* objecting to the admissibility of the source spreadsheets on the basis that (1) the spreadsheets constitute "testimonial hearsay" that are inadmissible without the testimony and cross examination of the witness who prepared the spreadsheets; and (2) the spreadsheets do not constitute business records because they were specially prepared by the insurers in direct response to a grand jury subpoena for use at trial.  Dkt 143 at p. 7-9.  The judge ruled that the source spreadsheets were properly authenticated and business records.  Dkt 149 at p. 5.  The defense renewed these objections during trial.

These source spreadsheets were admitted as evidence at trial.  The government, through FBI Special Agent Bryan Taylor, also used these source spreadsheets to create summary spreadsheets (trial exhibit no. 118 through 123) and calendars for each testifying patient witness

displaying all the claims submitted by Dr. Belcher and Dr. Ganesh (trial exhibit no. 146 through 153).  These summary spreadsheets and calendars were frequently displayed to the jury.

The source spreadsheets are undeniably "testimonial hearsay": (1) they are out-of-court statements by the insurers that the government offered to prove the matter asserted therein: to wit, the bills submitted to the insurers by Dr. Belcher, and (2) they were specifically prepared in response to grand jury subpoenas anticipation of litigation.

The Supreme Court has held that "testimonial" hearsay is inadmissible under the Sixth Amendment if the witness who provided the statement was not subject to cross examination. *United States v. Crawford, 541* U.S. 36 (2004).  The Supreme Court made it abundantly clear that "pretrial statements that declarants would reasonably expect to be used prosecutorially" are testimonial, including at a minimum "prior testimony at a preliminary hearing, **before a grand jury**, or at a former trial; and to police interrogations".  *Crawford*, 504 U.S. at 51, 68 (citations omitted) (emphasis added).

At trial the insurance representatives testified that the source spreadsheets admitted into evidence were **prepared in response to a grand jury subpoena**.  While they all provided signed affidavits attesting that the spreadsheets were "kept in the ordinary course of business", the affidavits were proven to be false because they testified that the spreadsheets were prepared and produced in response to a Grand Jury subpoena.  While the data may have been stored as a regularly conducted business activity, the actual source spreadsheets which were admitted as evidence, were not.  The insurers do not regularly create and maintain such source spreadsheets in the ordinary course of business.  The very characteristic that makes them testimonial are the same characteristics that make them not business records.  And because the government (which served the subpoenas and requested production of the spreadsheets and affidavits) knew the affidavits

were false at the time they were submitted to the court, Dr. Belcher's constitutional confrontation and due process rights were violated, and he should be granted a new trial.

The Supreme Court in *Crawford's* holding is based on the framer's desire to prevent "trial by affidavit," which is precisely what the government did during this trial. None of the insurance witnesses that testified at trial actually prepared the source spreadsheets. The source spreadsheets were prepared by some other out-of-court witness who was not available to Dr. Belcher to cross examine during trial, and as a result Dr. Belcher was deprived of any meaningful ability to examine the completeness, accuracy, propriety and reliability of these source spreadsheets. This fundamentally challenges that quest for justice inherent in a trial proceeding and deprived Dr. Belcher of not only his confrontation rights, but also his constitutional rights to a fair trial, present a defense, and his due process right to reliable evidence. This is evermore concerning because during trial, one insurance witness, Alex Kondrentanko from Blue Shield California, testified that these source spreadsheets contained mistakes.[6] With the reliability of the source spreadsheets in question, it is objectionable that Dr. Belcher was never allowed to exercise his constitutional right to cross examine the individuals who actually prepared the source spreadsheets.

## V.    CONCLUSION

For the foregoing reasons, this Court should grant Dr. Belcher's motion for judgment of acquittal on Count 16 of the indictment, or alternatively grant his motion for a new trial.

Respectfully submitted,

Dated:  January 19, 2018                        /s/
                                            NAOMI CHUNG
                                            BRENDAN HICKEY
                                            Counsel for Gregory Belcher

[6] At the time of filing this motion, counsel had yet to receive a copy of Alex Kodrentanko's testimony. Counsel relied on notes from trial.

30