1  ALEX G. TSE (CABN 152348)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  JEFFREY D. NEDROW (CABN 161299)
   PATRICK R. DELAHUNTY (CABN 257439)
5  Assistant United States Attorneys

6       150 Almaden Boulevard, Suite 900
        San Jose, California 95113
7       Telephone: (408) 535-5045
        FAX: (408) 535-5066
8       Email: Jeff.nedrow@usdoj.gov
        Email: Patrick.delahunty@usdoj.gov
9

10 Attorneys for United States of America

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14 UNITED STATES OF AMERICA,          )  CASE NO. 16-CR-00211 LHK
                                      )
15          Plaintiff,                )  UNITED STATES' OPPOSITION TO
                                      )  DEFENDANTS' SECOND MOTION FOR A NEW
16     v.                             )  TRIAL
                                      )
17 GREGORY BELCHER,                   )
                                      )
18          Defendant.                )
   _____)

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**I.     Introduction**……………………………………………………………………..1

3

**II.    The Court Has Jurisdiction to Deny Both Motions**…..…………………………**2**

4

**III.   Evidentiary Background: The Evidence at Trial Established Beyond a Reasonable**

5

**Doubt that Belcher and Ganesh Were Guilty**……………………………………...**2**

6

**A.  The Evidence in Support of Belcher's Verdict**…………………………...**2**

7

**B.  The Additional Evidence in Support of Ganesh's Verdict**……………………**6**

8

**IV.   The Defendant's Rule 33 Argument Fails**……………………………………**8**

9

**A.  Legal Standard**…………………………………………………...**8**

10

**B.  The Defendants Have Not Established New Evidence**………………………...**8**

11

**1.     The Defendants' Evolving Arguments Regarding the Source Spreadsheets**

12

**Admitted at Trial Do Not Amount to Newly Discovered Evidence Under Rule**

13

**33**……………………………………………………………………...**8**

14

**2.     The Defendants' Circular Reasoning to Substantiate their Claims Falls Short**

15

**of Establishing The Purportedly "New" Evidence**…………………………...**10**

16

**C.  The Purported "New" Evidence is also Not Material and Would Not Result in An**

17

**Aquittal**…………………………………………………………………………**11**

18

**1.  The Cassman Motion**……………………………………………**12**

19

**2.  The TriZetto emails, Reynolds Letter, Reinshagen Declaration, and Flores**

20

**"Report"**…………………………………………………………**13**

21

**D.  The Defendants' Motions Fail the Other Prongs Under Rule 33**……………………**16**

22

**V.     Belcher's Claim of Ineffective Assistance of Counsel**……………………………**17**

23

**VI.    There was No *Brady* Violation**……………………………………………**18**

24

**VII.   A Discovery Hearing is Not Warranted**……………………………………...**19**

25

**VIII.  Conclusion**………………………………………………………………**20**

26

27

28

# TABLE OF AUTHORITIES

## Cases

*Baumann v. United States*,
  692 F.2d 565 (9th Cir. 1982) ................................................................................................ 8

*Brady v. Maryland*,
  373 U.S. 83 (1963) ................................................................................................... 18, 19

*Moore v. Illinois*,
  408 U.S. 786 (1972) ............................................................................................................ 18

*Strickler v. Greene*,
  527 U.S. 263 (1999) ............................................................................................................ 19

*United States v. Arias-Izquierdo*,
  449 F.3d 1168 (11th Cir. 2006) .......................................................................................... 20

*United States v. Brugnara*,
  856 F.3d 1198 (9th Cir. 2017) ....................................................................................... 8, 16

*United States v. Cronic*,
  466 U.S. 648 (1984) .................................................................................................... 2, 3, 5

*United States v. Eldred*,
  588 F.2d 746 (9th Cir. 1978) ....................................................................................... 10, 12

*United States v. Hanzeem*,
  679 F.2d 770 (9th Cir. 1982) .............................................................................................. 18

*United States v. Lara-Hernandez*,
  588 F.2d 272 (9th Cir. 1978) .............................................................................................. 18

*United States v. McKinney*,
  952 F.2d 333 (9th Cir. 1991) .............................................................................................. 10

*United States v. Quinn*,
  123 F.3d 1415 (11th Cir. 1997) .......................................................................................... 20

*United States v. Venegas-Reynoso*,
  524 F. App'x 373 (9th Cir. 2013) ....................................................................................... 19

*United States v. Weld*,
  No. 08-CR-83 PJH, 2009 WL 901871 (N.D. Cal. Apr. 1, 2009) ....................................... 20

*Weatherford v. Bursey*,
  429 U.S. 545 (1977) ............................................................................................................ 19

*Wood v. Bartholomew*,
  516 U.S. 1 (1995) ................................................................................................................ 19

## Statutes

18 U.S.C. § 1035 .......................................................................................................................... 6

## Rules

Fed. R. Crim. P. 33(b)(1) ...................................................................................................... 9, 16

Fed. R. Crim. P. 33(b)(2) ........................................................................................................... 9

Fed. R. Crim. P. 37(a)(3) ............................................................................................................ 2

The United States of America, by and through its attorneys of record, herein opposes Dr. Gregory Belcher's and Dr. Vilasini Ganesh's second motions for a new trial under Rule 33. *See* ECF No. 490 (Belcher motion) and ECF No. 513 (Ganesh joinder and motion).

## I.    Introduction

Belcher and Ganesh have repeatedly assailed the accuracy and admissibility of the Source Spreadsheets.[1]  Their efforts have repeatedly failed.  *See* ECF Nos. 149 (Order re: motions in limine), 361 (Order denying Belcher's motion for acquittal), 445 (Order denying Ganesh's motion for acquittal), and 455 (Order regarding Ganesh's Second Application for a Rule 17(c) subpoena).  Most tellingly, the jury rejected the defendants' arguments with its verdict, which followed a trial that included multiple instances of the defendants attempting to discredit and undermine the weight of the spreadsheets through cross-examination of witnesses employed at each insurer.  Att. 6 (RT 11/14 at pp. 40, 52-55, and 84-87 (Richer/Aetna); 11/20 at p. 15-16 (Richer/Aetna); 11/20 at pp. 86-87 (Kearney/Optum-United); 11/20 at pp. 191-93 (Kahler/Cigna); and, 11/21 at pp. 26-27, 30-33, and 36-38 (Kodratenko/Blue Cross)).  To date, Belcher and Ganesh have failed to identify a single inaccuracy in the Source Spreadsheets, as discussed further below.  Their most recent motions simply recycle claims previously considered, and rejected, by the Court on multiple occasions.

Furthermore, this is Belcher and Ganesh's second motion for a new trial.  The Court denied their prior new trial motions (which were filed separately).  ECF Nos. 361 and 445.  In the motions at bar, Belcher and Ganesh fall far short of establishing a basis to grant a new trial under Rule 33.  The "new" evidence they cite are admitted trial exhibits, which do not amount to new evidence.  Similarly, Belcher's claim that purported ineffective assistance of counsel is new evidence is based on factual inaccuracies about his prior counsel and a specious interpretation of Rule 33.  Finally, Belcher establishes nothing more than pure speculation about a *Brady* violation and makes no effort to establish the violation was material.[2]  The motions should be denied.

---

[1] Belcher and Ganesh do not define this term, but the government understands it be a reference to Government Trial Exhibits 15(a) – (c), 37(a) – (e), 38(a) – (c), 39(a) – (d), 40(a) – (d), 42(a) – (i), and 88(a).  Used herein, "Source Spreadsheets" refers to these trial exhibits.

[2] It is unclear if Ganesh also joins Belcher's motion as to the purported ineffective assistance and alleged *Brady* violation.  ECF No. 513.  To the extent she does, the government requests that its

II.     **The Court Has Jurisdiction to Deny Both Motions**

Belcher filed his present motion more than three months after the final judgment and conviction was entered in this case.  ECF No. 406.  Indeed, he filed it after filing a notice of appeal.  CA No. 18-10133.  Despite the pending appeal, this Court has jurisdiction to *deny* Belcher's new Rule 33 motion.  Fed. R. Crim. 37(a)(2).  But this Court lacks jurisdiction to grant Belcher's motion.  At most, the Court can issue an indicative ruling to the Ninth Circuit pursuant to Fed. R. Crim. P. 37(a)(3).  *See United States v. Cronic*, 466 U.S. 648, 667 n.42 (1984).

III.    **Evidentiary Background: The Evidence at Trial Established Beyond a Reasonable Doubt that Belcher and Ganesh Were Guilty**

A.      **The Evidence in Support of Belcher's Verdict**

Belcher is an orthopedic surgeon.  Although he performed surgeries at various hospitals, he maintained an office in Saratoga, California, and in approximately 2005 he asked Ganesh to move her practice to the same space.  Att. 1 11/28 RT 243:22-24.[3]  From that point forward, Belcher and Ganesh worked together, and within a few years began living together, had children together, and agreed that they were "married."

From the moment Ganesh moved her practice into Belcher's office space, and continuing until at least 2015, Ganesh fraudulently billed insurers.  ECF No. 299 (verdict).  Ganesh's insurers received fraudulent claims that were false in a number of respects, but the three most common were (1) falsely identifying the date of service, (2) falsely identifying the care provided, and (3) falsely identifying the doctor that provided the care.  Belcher became aware of Ganesh's fraudulent billing as early as 2005 when Ganesh and Belcher's medical biller, Ms. Landis, whom Belcher described as being like "family," told Belcher that she was concerned with Ganesh's billing because Ganesh, almost exclusively, claimed the same two billing codes for reimbursement in each claim.  RT 10/24 94:13-25 (Landis); 11/28 RT 236:8-12 (Belcher description of "like family").

---

response on both issues be applied to both defendants' motions.

[3] Unless otherwise noted, all trial transcripts referenced herein are contained in Attachment 1, and the attachment is organized chronologically.  Page numbering tracks the number assigned on the top right of the version of the transcript attached.  Attachment 6 reflects a separate, limited set of record excerpts.

Belcher was not just aware of the fraud, though.  He engaged in it.  For example, Ms. Landis testified that Belcher "was always involved" in Ganesh's billing.  RT 10/24 98:16-18 (responding to question, "Do you remember approximately when Dr. Belcher became personally involved in Dr. Ganesh's billing?").  And Belcher admitted helping Ganesh defraud insurers.  Specifically, Belcher submitted "stacks" of Ganesh's fraudulent claims to insurers between 2010 and 2014.  RT 12/1 52:9 (Belcher admission regarding "stacks"); 202:5-10 (years).  He did so by taking the information Ganesh scribbled on "superbills," which were one-page forms with various boxes associated with various CPT codes.  RT 12/1 51:21-54:16.  Most of these superbills reflected a patient name, various dates scribbled in colored marker, and one (or perhaps both) of the two CPT codes Ganesh assigned to each visit: 99215 and 99245.  RT 12/1 51:21-54:16 (Belcher describing codes on bills); Att. 2 (Gov. Exs. 111-3, 111-25, 111-27) (example superbills submitted in 2013 and 2014 for patients called at trial).  These codes had the highest reimbursement rates, as Belcher knew at the time.

The fraudulent nature of these superbills was self-evident.  For example, Ms. Jamison, the biller hired by Belcher and Ganesh after Ms. Landis was terminated, was tasked in 2006 with nearly the identical task that Belcher admitted to.  *E.g.,* RT 10/24 219:19-22 (inputting information on superbill into HCFA 1500 form); 220:9-23 (same).  That is, Ganesh gave Ms. Jamison stacks of Ganesh's superbills and asked her to submit claims for reimbursement to insurers.  *Id.*; *see also id.* at 214:13-215:3 (receiving superbills).  Despite having no training in the meaning or application of CPT codes (she merely input the data on the superbills), Ms. Jamison quickly determined that Ganesh was fraudulently billing insurers.  *See* RT 10/24 198:20-21 ("But to me, it felt like she [Ganesh] was committing fraud and I wasn't comfortable.")

Belcher admitted at trial that between 2010 and 2014 he performed the same work for Ganesh that Ms. Jamison did:

> Q: And you would take these stacks of superbills and input them into the Lytec system, which was essentially the billing system that would generate the HCFA forms; correct?
>
> A: Yeah, that's correct.
>
> Q: And then at that point it went to the insurers, didn't it?
>
> A: It went to the clearing house.

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1       Q: And then to the insurer?

2       A: Right.

3       Q: You were the last person that physically put in information regarding that claim; correct?

4

5       A: Right. But, again, just as Lori Landis testified here—

       Q: I'm not asking about other witnesses.

6

7       . . .

8       A: Well, I did not put—or change any diagnostic, diagnosis codes or any CPT codes.  That is the actual billing, whoever writes the codes.  I didn't do that.  I was just simply inputting data.

9

10      Q: You say inputting data, but you were taking a superbill and, from that, creating the actual claim that was submitted to insurance companies, weren't you?

11

12      A: Just like all the medical assistants that sat here.  Just like Lori Landis and Cindy Jamison.  It's the same process of putting information.

13  12/1 RT 163:1-25 (Belcher).

14       Belcher, however, was in an even better position to identify the fraud Ms. Jamison.  Unlike her,

15  Belcher was familiar with the proper use and application of the CPT code commonly abused by Ganesh

16  (99245).  12/1 RT 164:4-166:14.  Yet Belcher, by his own admission, continued to submit Ganesh's

17  fraudulent claims for "years."  12/1 RT 53:15-17.

18       Belcher did not limit his submission of false claims to Ganesh's patients.  He submitted false

19  claims for his own patients as well.  Specifically, he commonly submitted false claims to insurers for the

20  care patients received at his physical therapy practice.  The claims were false in numerous respects, but

21  two falsities were common: (1) the claims identified a false date of service, and (2) the claims falsely

22  coded the care provided to disguise that the patient had merely received a massage.  As to the latter,

23  testimony at trial established that it was common knowledge amongst health care professionals that

24  insurance would not cover massages.  Indeed, senior fraud investigators from each insurer testified that

25  they commonly investigated such false claims that attempted to seek reimbursement for massages.  *E.g.*,

26  11/20 RT 181:2-7 (Kahler) ("So massage therapy typically isn't covered in most of our benefits, so we'll

27  typically deny it because it's just not a covered benefit."); 188:12-13 (Kahler).

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1    The false physical therapy claims related to patients who frequently received a massage and

2  physical therapy on the same day.  RT 12/8 34:6-43:8.  Witnesses called by both the government *and*

3  Belcher established this pattern.  For example, patient M.H. was scheduled throughout 2012, 2013, and

4  2014 for massages and physical therapy on the same date.  *Id.*  Yet Belcher changed the dates of the

5  service in the claims he submitted, thereby indicating to insurers that the visits occurred on two different

6  dates.  Belcher did the same thing for patient L.M., whom Belcher called as a witness.  *Id.* (testimony by

7  Belcher regarding L.M.).  And Belcher's own testimony established that he acted knowingly: Belcher

8  admitted that he commonly submitted false claims when two therapy sessions were offered on one day,

9  admitting it was his practice to falsely identify the date of care for such care throughout 2012, 2013, and

10  2014.  *Id.*  Belcher knew it was improper to submit these false claims:

11          Q: Let's start with this.  You would agree it's improper to bill an insurance
            company for—that asserts care was provided on a day when there was no care
12          provided that day?  You would agree that's improper?

13          A: Yes. Yes.

14  RT 12/1 219:4-8 (Belcher).

15          Indeed, Belcher was warned that submission of false and inaccurate claims could result in

16  criminal penalties each time he submitted a claim.  For example, claims received by health care insurers,

17  including M.H.'s insurer, Cigna, are received on a HCFA 1500 form.  11/20 RT 173:11—19 (Kahler);

18  Att. 3 (Gov. Ex. 143) (blank HCFA 1500 form).  Each HCFA 1500 form includes a jurat, requiring the

19  submitting health care provider to attest under penalty of perjury that the claim is accurate and to

20  acknowledge that false information in the claim exposes the provider to criminal and civil penalties.

21  11/20 RT 173:11-174:22.

22          Amongst the multitude of false claims submitted by Belcher, one submitted to Cigna on or about

23  November 26, 2013, asserted that care was provided to M.H. on November 25, 2013—a Saturday.  But

24  Belcher's physical therapy office was closed on weekends.  There was no sign-in sheet or Google

25  calendar entry that indicated M.H. was seen in the office that day, either.  In contrast, M.H. received

26  *both* a massage and physical therapy on the preceding Friday *and* on the following Monday.  As a result,

27  the claim was false and inaccurate, and it represented an example of the common false claim that

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1    Belcher submitted in 2012, 2013, and 2014.  This claim was charged as Count 16, in violation of 18

2    U.S.C. § 1035.  The jury, after weighing the evidence and credibility of the testimony offered, including

3    Belcher's testimony, found him guilty on this count.

4    **B.    The Additional Evidence in Support of Ganesh's Verdict**

5    Ganesh admitted at trial that she primarily, and almost exclusively, submitted claims to her

6    patients' insurers that identified only one of two CPT codes.  *E.g.* RT 11/27 at p. 247:4-12.  For

7    example, Ganesh testified:

8         Q.      Dr. Ganesh, isn't it true that actually between 2008 and 2014, I
             mean, on hundreds, if not thousands of times, you submitted 99215 and
9            99245 claims to the insurance companies, is that correct?

10        A.      Those are the only codes we used, I believe.

11   RT 11/27 at p. 250:18-22.  Additionally, the Source Spreadsheets reflected her medical billing to five

12   major insurers and showed that Ganesh routinely submitted claims to insurers that indicated Dr. DeWees

13   treated Ganesh's patients—despite him having long since left the practice.  For example, Exhibit 38b

14   indicated a dramatic shift by Ganesh in 2010 and 2011; prior to that time period, Ganesh submitted

15   claims to Anthem identifying Ganesh as the providing doctor, while after that period, Dr. DeWees was

16   identified.[4]  Additionally, a multitude of patients, when confronted with examples of bills submitted

17   regarding their purported care, confirmed that they were not seen on the dates claimed.

18   Ganesh offered two basic defenses of this practice at trial.  For example, she testified that the

19   reason she billed almost exclusively two CPT codes was because there was a purported "template" from

20   Dr. DeWees (the doctor from whom she acquired the practice) that she followed as "the bible."  RT

21   11/27 at p. 253:6-10.  Indeed, Ganesh frequently attempted to shift the blame for her fraudulent billing

22   to Dr. DeWees, asserting repeatedly that she was merely following the example he had set.  RT 11/27 at

23   pp. 247-253; 11/28 at pp. 30, 41 ("I followed what he [DeWees] was doing.").  Ganesh also offered a

24   second justification for her fraudulent billing at trial.  Specifically, she asserted that she had not

25   defrauded insurance companies, but instead, the insurance companies had defrauded her because they

26   "paid me [Ganesh] nothing."  She testified (in one narrative answer):

27

28   ———————————
     [4] The pattern is evident by comparing the worksheets (or tabs) ending -871 and -757.

1    I didn't get paid since 2012, 2013. All the major insurances paid me nothing.

2    And then I get hit with fraud charges. I -- I still today, I don't understand

3    that. Why? If you -- in reality, my understanding is that insurance company defrauded me out of payments, paid me nothing for all my work

4    that I've done so far. Why is it that I'm accused of fraud when I got defrauded and then I'm accused of fraud? That didn't make any sense to

5    me.

6    I worked very, very hard and I got paid nothing. They said they were going to pay me, they're going to renew the contract, and that never

7    happened and I don't understand. I don't understand the legal system.

8    But if -- insurance company pay me nothing. I worked very hard, provided endless hours of patient care on Friday, Saturday, every day, and I don't

9    get paid.

10   And after several years, they hit me with charges saying I committed fraud. I'm thinking, who committed fraud on who? I got defrauded out of

11   payments for all my hard work. You hire somebody, you don't pay them for years, whatever. Then you turn them in to the police or whoever, the

12   law enforcement.

13   I'm thinking, I didn't commit fraud. I never committed fraud. I worked very hard. I went above and beyond to provide The best medical care for

14   my patients and insurance company paid me nothing for whatever excuses they had, or lame reasons why they didn't want to pay, and they cut off my

15   contracts.

16   They even lured me in saying, "we'll renew your contract, keep seeing patients." And I keep working and I work – I worked -- I didn't care about

17   the money because I was passionate about medicine. I was so passionate about patient care, I didn't care. And I'm thinking, who -- after the charges

18   -- I was hit with these charges a year and a half ago. I was getting anxiety, panic attacks. I was very confused. I was frustrated.

19   How is that -- if they pay me, or overpay me, they can say I did fraud. If

20   they never paid me, paid me nothing, how --who committed fraud on who?

21

22   RT 11/27 at 241-42.

23        This was false testimony. Ganesh was paid hundreds of thousands of dollars by insurers

24   throughout this time period. For example, Exhibit 128 showed that Ganesh and Belcher were paid more

25   than $800,000 from just two insurers between 2010 and 2014. Att. 4. Similarly, Ganesh was

26   confronted, after making this statement, with the fact that she had been paid more than $500,000 for her

27   work on weekends. RT 11/27 at pp. 256-258. The jury rejected Ganesh's argument, finding her guilty

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

7

1    on all substantive health care fraud counts and false statement counts.

2    **IV.    The Defendants' Rule 33 Argument Fails**

3        **A.    Legal Standard**

4        The standard governing a new trial motion brought on the basis of new evidence is well

5    established.  The Ninth Circuit has held that "[t]he correct legal rule is that a defendant is entitled to a

6    new trial based on newly discovered evidence only when he can show the following: (1) the evidence is

7    newly discovered; (2) the defendant was diligent in seeking the evidence; (3) the evidence is material to

8    the issues at trial; (4) the evidence is not (a) cumulative or (b) merely impeaching; and (5) the evidence

9    indicates the defendant would probably be acquitted in a new trial."  *United States v. Brugnara*, 856

10   F.3d 1198, 1206 (9th Cir. 2017).

11       Evidence is not "newly discovered" if a defendant continues to assert the same claims he

12   asserted at trial, and "all of the underlying facts relevant to [defendant's] present allegations of newly

13   discovered evidence were within his knowledge at the time of trial and could have been substantiated

14   with the exercise of reasonable diligence."  *Baumann v. United States*, 692 F.2d 565, 579–80 (9th Cir.

15   1982).

16       **B.    The Defendants Have Not Established New Evidence**

17           **1.    The Defendants' Evolving Arguments Regarding the Source Spreadsheets
                     Admitted at Trial Do Not Amount to Newly Discovered Evidence Under Rule
18                   33**

19       Belcher and Ganesh's motions are yet another attack on the admissibility of the Source

20   Spreadsheets.[5]  These documents were admitted at trial, and the parties litigated their admissibility

21

22       _____

         [5] The Source Spreadsheets reflected information kept and stored in the normal course of business
23   by the Insurers in large databases.  RT 11/14 12:1—15:5 and 35:5—39:16 (Richer, Aetna); 11/20 175:2-
     -23 (Kahler, Cigna) and at 79:9—81:14 (Kearney, United) and 210:15-2 (Kodratenko, Blue Shield) and
24   11/21 4:23—6:23, 8:17—9:20 (same); 11/21 82:5-85:5 (Haskins, Anthem).  This was explained by a
     senior employee of each Insurer who was personally familiar with storage of such information and their
25   employer's ability to recall the data by generating billing reports specific to certain doctors or other
     common queries.  Specifically, when the Insurers received claims from health care providers, they
26   uploaded the claim date (automatically or through manual transcription of paper claims) to a database.
     This gave the Insurer the ability to query the database and generate reports that provided limited data
27   sets.  Contrary to Belcher's assertion, the overwhelming evidence at trial established that the databases,
     and the Source Spreadsheets by extension, were accurate because the Insurer's accurately tracked and
28   maintained the data submitted to it on claims for reimbursement in the databases.  *Id.*  Doing so was
     essential to their business.  *Id.*

before, during, and after trial.  The accuracy and reliability of the spreadsheets was also litigated before, during, and after trial, including at sentencing.  Belcher and Ganesh concede as much.  ECF No. 490 at p. 10 ("Each of these exhibits were admitted at trial on November 6, 2017 subject to all prior objections, litigation and court rulings on the admissibility of the 'insurance source spreadsheets.'") and ECF No. 513 at p. 2 (Ganesh acknowledging a long history of attacking the accuracy of the Source Spreadsheets, including in her *first* motion for new trial).  Yet Belcher and Ganesh inexplicably assert that their still-evolving arguments attacking the Source Spreadsheets amount to "new" evidence.  *E.g.*, ECF No. 490 at 23.

Belcher and Ganesh cite no legal authority that supports this perplexing argument, and none exists.  Instead, in their new Rule 33 motions, the defendants list a number of challenges to the weight of the spreadsheets admitted at trial, and then seek to relitigate the legal and factual bases which led this Court to rule these documents admissible.  Specifically, Belcher (and by extension, Ganesh) begins by listing a series of trial exhibits (all of where were Source Spreadsheets) and commenting on them.  *E.g.,* ECF No. 490 at pp. 6-10.  Belcher then goes on to characterize how he believes the government "presented the Spreadsheets" at trial, citing to a number of different parts of the trial record.  *Id.* at pp. 11-13.  From there, Belcher argues that the manner in which the government "presented" the Source Spreadsheets at trial violated due process.  *Id.* at pp. 13-14.  Following that, Belcher goes on to characterize the manner in which the government has litigated the admission and relevance of the Source Spreadsheets in three other contexts: (1) opposing Ganesh's motion for new trial (2) opposing Belcher's motion for bail pending appeal, and (3) opposing an improper application under Rule 17(c) by Ganesh.  *Id.* at pp. 14-19 (paraphrasing and quoting—without including all citations to the record offered by the government—various filings by the government).

But new attacks on old evidence are not new evidence within the meaning of Rule 33.  And *old* attacks on old evidence, as here, certainly do not meet that definition.  Where a motion for new trial is brought more than "14 days after the verdict or finding of guilty," Fed. R. Crim. P. 33(b)(2), the evidence must be "grounded on newly discovered evidence."  Fed. R. Crim. P. 33(b)(1).  Evidence is not

newly discovered under the rule if it was known to the defendant during trial. *E.g., United States v. McKinney*, 952 F.2d 333, 336 (9th Cir. 1991); *United States v. Eldred*, 588 F.2d 746, 753 (9th Cir. 1978).

Here, not only was the purported "new" evidence admitted at trial; Belcher and Ganesh frequently attempted to challenge its reliability by showing purported inaccuracies during the trial. *E.g.*, RT 11/14/2017 at 40, 52-55, 84-87); RT 11/20/2017 at 15-16, 86-87, 191-93; RT 11/21/2017 at 26-27, 30-33, 36-38. The defendants' untimely Rule 33 motions do nothing more than continue to recycle and assert the same arguments which this Court has considered and rejected. There is nothing new here, and because of that, nothing about the defendants' claim in terms of new factual material which satisfies Rule 33(b)(1)'s "newly discovered evidence" requirement.

### 2. The Defendants' Circular Reasoning to Substantiate their Claims Falls Short of Establishing The Purportedly "New" Evidence

The defendants assert that they learned of inaccuracies in the Source Spreadsheets for the first time in March 2018. *See* ECF No. 490 at p. 23 (Belcher), ECF No. 513 (Ganesh). To support this claim, Belcher cites: (1) an administrative motion filed by Ganesh's then-attorney, Ted Cassman, to supplement her first motion for new trial (ECF No. 374), which was denied, (2) an unsworn letter Belcher attached to his sentencing memorandum from an employee of Medsoftware (ECF No. 384-11, hereinafter the "Reynolds' Letter"), (3) a declaration from Lisa Reinshagen, who purports to only be "proficient" in using Lytec/Gateway software (ECF No. 491), and (4) the purported expert report of Mark Flores (ECF 513-1).

These documents form a garden of circular paths which lead nowhere. For example, in the Reinshagen Declaration, ECF No. 491, Reinshagen actually relies on, cites back to, and attaches emails from two employees of TriZetto (who owns the Lytec/Gateway software) to substantiate her statements. ECF 491 at p. 4.[6] Those emails were previously put before the Court once already by Belcher in his

---

[6] Belcher filed a Supplemental Declaration of Lisa Reinshagen, but it includes no analysis. ECF No. 497-1. It merely attaches what she purports is a "true and correct copy" of the "Dr. Gregory Belcher's Lytec" source database. It is unclear how she knows it is "true and correct" and unaltered. Regardless, neither she nor Belcher offers any discussion about. It is unclear what the purpose of attaching it was.

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1    sentencing memorandums.  They are old news.  Ganesh, in joining Belcher's motion, also relies on

2    Reinshagen (who relies on the TriZetto emails) as purported examples of "new" evidence.  Ganesh cites

3    another purported "expert report" from Mark Flores, but Flores merely cites to and paraphrases the

4    Reinshagen declaration, which as described, merely cites and describes the TriZetto emails and

5    paraphrases the same arguments made by Cassman.  Neither defendant appears to acknowledge the

6    circular reasoning of citing each other's previous motions (all of which have been denied or rejected).

7    Nor does either defendant acknowledge that repeating the same baseless and rejected allegation (and

8    citing the same evidence) does not lead to a multiplication or growing list of purported inaccuracies.  *See*

9    ECF No. 513 at p. 2 (Ganesh asserting "mounting" inaccuracies in the Source Spreadsheets).

10        Indeed, Ganesh, by joining Belcher's motion, cites her own previous motion for a new trial as

11   the basis of the "discovery" of new evidence to support her *second* motion for new trial.  *See* ECF No.

12   513 at p. 1 (Ganesh joining Belcher motion, ECF No. 491) *and compare* ECF No. 491 at pp. 14-15

13   (Belcher motion citing and discussing Cassman motion) *and compare* ECF No. 374 (Cassman motion

14   filed in support of Ganesh motion for new trial).  It is absurd.

15        As to all these purported sources of "new" evidence, including the Reinshagen declaration, none

16   amount to "newly discovered evidence" under Rule 33(b)(1).  This is true regardless of the fact that the

17   Cassman declaration, TriZetto emails, and Reynolds letter have already been litigated and found to lack

18   credibility by this Court in prior rulings.  As to the other two purportedly "new" sources, the Reinshagen

19   declaration and Flores "report," both of those simply cite back to the other three sources and recycle

20   their failed logic.[7]

21        **C.    The Purported "New" Evidence is also Not Material and Would Not Result in An**
             **Acquittal**

22

23        Leaving aside whether the defendants have actually presented new evidence, their motions also

24   fail because the purported "new" evidence is not material and would not be likely to result in an

25

26   _____

27        [7] Belcher also attempted to supplement his oversized motion by attaching seven 1500 forms in a
     purported supplement filing.  ECF No. 495.  He provides no analysis of them and no authentication of
     them.  *Compare* 490 at p. 20 (asserting unspecified claim forms, which were not attached to his original
28   motion, show inaccuracies in Source Spreadsheets, but providing no explanation).

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1   acquittal.  This is because Belcher and Ganesh, despite repeating the same allegation, have never

2   established an actual inaccuracy in the Source Spreadsheets.  That remains true.  To understand why,

3   each purported example of allegedly "proven" inaccuracies must be examined.

4            **1.       The Cassman Motion**

5        The Cassman motion, ECF No. 374, was filed in support of Ganesh's motion for new trial.

6   Although the motion was denied, it included an argument that a number of different rows in various

7   Source Spreadsheets were allegedly not relevant to any fact at issue in the trial.  Through Cassman,

8   Ganesh argued that to the extent a spreadsheet included a few rows (out of an aggregate amount of more

9   than a hundred thousand rows of information in the Source Spreadsheets) that detailed the billing of Dr.

10  DeWees or Dr. DeWees' medical partners after Dr. DeWees ceased to practice with Ganesh (Dr.

11  Borodoulin), the entire document was irrelevant and inadmissible.  *Id.*

12       Cassman, and now Belcher and Ganesh, describe Cassman's argument as a "discovery" of new

13  evidence.  But what Cassman "discovered" was *reflected on the face of the documents.*  It was not

14  hidden.  It did not require math or expertise to discern.  Moreover, the defendants had the information

15  for years.  Most of the Source Spreadsheets were produced to the defendants approximately two years

16  *before* they were introduced at trial.  In addition, these documents were, of course, introduced at trial,

17  and thus cannot reasonably be characterized, at this juncture, as "new" evidence.

18       If anything, Cassman's "discovery" is nothing more than a repackaged and newly articulated

19  attack regarding the relevance of certain Source Spreadsheets.  The government has already explained

20  why Cassman did not find anything "inaccurate" in the spreadsheets or establish that they were

21  inadmissible.  *See* ECF No. 376.  Belcher and Ganesh remain undeterred.  They again misunderstand

22  and mischaracterize the relevance of the limited data points identified by Cassman and the application of

23  Rules of Evidence 401 and 403.  *See* ECF No. 376 (government response to Cassman motion).    As the

24  government previously argued, which Belcher acknowledges in his motion at pages 15 and 17, the

25  relevance of Dr. DeWees' billing at Campbell Family Practice (which he joined after leaving Ganesh) is

26  that it shows the true billing nature and patterns employed by Dr. DeWees, which was squarely relevant

27  at trial because Ganesh repeatedly claimed that her billing practice was based upon a "template"

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

developed by Dr. DeWees.

## 2. The TriZetto emails, Reynolds Letter, Reinshagen Declaration, and Flores "Report"

*The TriZetto Emails*

Belcher and Ganesh also rely on several emails sent by TriZetto to Belcher.  They do so in a byzantine manner.  Belcher cites a declaration of Lisa Reinshagen, who in turn attaches the TriZetto emails.  *See* ECF No. 491.  Ganesh joins the Belcher motion, and in so doing, also attaches a purported expert report of Mark Flores, who in turn refers to Reinshagen's declaration in Belcher's motion.  ECF No. 513-1.  The TriZetto emails were originally attached to Belcher's sentencing memorandums.  Regardless, the emails were written at the behest of Belcher, and their authors do not attest to anything under penalty of perjury.  It is unclear if the authors of the emails are even authorized to speak on behalf of TriZetto.

The TriZetto emails are vague.  Read generously, they appear to indicate that TriZetto purportedly confirmed that this scenario did not happen: a claim was submitted electronically that listed (1) the NPI number –8935 for Dr. DeWees (2) and his TIN number -3757, and (3) him as the rendering physician.  ECF No. 391 at Att. 4 (Belcher Response Memo.) ("After further review, I do not show any claims have been submitted through our clearinghouse for Edward DeWees, MD rendering NPI[8]: --8935 TIN -3757 between the dates of 1/1/2005 – 3/30/18.").  It also appears to assert that, at least according to TriZetto, Dr. DeWees is associated with only one TIN, -3757.

TriZetto's email leaves open a few different scenarios.  First TriZetto's email does not exclude the possibility that Belcher submitted electronic claims that identified Dr. DeWees as the rendering physician *without* listing his NPI number in the claim.  Indeed, Exhibit 38(b) indicates a large number of claims submitted under TIN -3757 that list Dr. DeWees as the provider and—at the same time—list the NPI as "unknown".  In fact, there are 633 claims that fit this profile.  As a point of comparison, there are 938 claims that list Dr. Wees as rendering physician, his TIN, and his rendering physician NPI.  It is this latter group that TriZetto appears to have screened for.  Thus, all that TriZetto has shown is that at least

[8] An NPI refers to a unique identifier of health care providers for purposes of submitting claims.

938 claims listing Dr. DeWees as the rendering physician may not have been submitted with Gateway software. As to the 633 claim, the TriZetto email does not eliminate the possibility that Belcher submitted them electronically.

Second, TriZetto's email leaves open a second scenario. In that scenario, a claim was submitted electronically with (1) Ganesh MD's NPI (ending -0847), (2) Dr. DeWees' TIN -3757, and (3) provider name as Dr. DeWees. As to this claim profile, 3,260 claims were submitted. The TriZetto email does not eliminate the possibility that Belcher submitted these claims electronically.

Third, and most importantly, the TriZetto letters _do not address the possibility of claims submitted to insurers by fax machine or on paper._ They are focused solely on electronic claim submissions. Without any effort to address fax or paper claim submissions, the TriZetto emails are uninformative when it comes to an analysis of the Source Spreadsheets. The TriZetto emails simply fail to contemplate that claims reflected in the Source Spreadsheets may have been submitted without using the Lytec/Gateway software. This is a glaring oversight, because there was extensive testimony at trial about Ganesh and her staff submitting claims via fax instead of electronically.

*The Rest of the Reinshagen Declaration*

It is unclear how Belcher and Ganesh found Lisa Reinshagen. She describes no history of working with them or even one of working with Lytec/Gateway. Instead, Reinshagen declares that she is merely "proficient" with Lytec/Gateway, and spent her career working with two *different* kinds of medical billing software. ECF No. 491. Notwithstanding whether Reinshagen has sufficient experience with Lytec/Gateway, whether she was permitted by the terms of the protective order to review the Source Spreadsheets,[9] and whether she has any first-hand knowledge of Belcher and Ganesh's practice, she lists a series of purported inaccuracies in the Source Spreadsheets. These inaccuracies are generally the same "purported" inaccuracies identified by Cassman. Specifically, both Cassman and Reinshagen assert that the Source Spreadsheets contain claim details regarding claims submitted by Dr. DeWees after he ceased working with Ganesh and had joined Dr. Borodoulin (some of whose claims are also in the Source Spreadsheets). This purported problem was addressed above.

---

[9] *See* ECF No. 20.

1    Beyond that, Reinshagen identifies purported anomalies between how Lytec/Gateway processes

2    a claim submitted electronically and how the claim is reported in the Source Spreadsheets.  She too does

3    not acknowledge that Ganesh commonly submitted paper claims via fax, and Reinshagen's declaration

4    appears to never contemplate this as an explanation.  It is an oversight that reflects the unreliability of

5    Reinshagen's analysis.

6    *The Reynolds Letter*

7    Belcher and Ganesh, but only in passing, rely upon a letter written by Eileen Reynolds at

8    Medsoftware, Inc.  *See* ECF 490 at p. 7 (Belcher motion) and ECF No. 513 (Ganesh joinder).  The

9    Reynolds letter was also attached to Belcher's sentencing memorandum.  ECF No. 384-11.

10   It is also unclear how Belcher found Reynolds.  Reynolds did not work for TriZetto (the

11   company that owns Lytec and Gateway) and she does not describe any background of working with

12   Ganesh or Belcher.  She makes no reference to the fact that Ganesh commonly submitted claims via fax

13   and paper submission.  Undeterred by the absence of any information suggesting a relevant background

14   to the task at hand, Reynolds opines at length (although not under penalty of perjury) about a series of

15   purported discrepancies between Lytec/Gateway's database of Belcher and Ganesh claims and the

16   insurance companies' database of claims data (as reflected in the Source Spreadsheets).  The analysis is

17   fundamentally flawed as result.  It does not contemplate, much less explain, the fact that Ganesh

18   commonly submitted claims by fax or via "hard copy."

19   There is another problem with the Reynolds letter.  Leaving aside the possibility of a number of

20   claims being submitted by paper, Reynolds (and the Reinshagen declaration) ask the Court to believe

21   that  there are limited instances in which the Lytec/Gateway software does not have the same data as the

22   insurer company's data, as reflected in the Source Spreadsheets.  Even if this were true (leaving aside

23   the issue of claims submitted via fax), the only inference to be drawn from Reynolds' letter (or the

24   Reinshagen declaration) is that within the ocean of claim data found in the Source Spreadsheets *and*

25   within the TriZetto/Lytec database, there are but a few speckles of anything resembling a difference.

26   Predictably, Belcher and Ganesh ignore the actual take-away of the Reynolds' letter and

27   Reinshagen declaration.  Both Reynolds and Reinshagen, in an effort to discredit the Source

28

1   Spreadsheets, actually illustrate the reliability of the Source Spreadsheets.   The Reynolds' analysis

2   actually corroborates the accuracy of tens of thousands of claims by only identifying a handful of claims

3   with any purported issues—thereby implying that the vast majority have no issues that either Reynolds

4   or Reinshagen have identified.  This once again corroborates the Source Spreadsheets' overall accuracy.

5   Additionally, if any emphasis is to be put upon the very limited number of differences between

6   Lytec/Gateway and the Source Spreadsheets (rather than an emphasis on the vast number of

7   similarities), it is unclear why the differences should undermine the reliability of the Source

8   Spreadsheets rather than raise questions about the quality of the data supplied by

9   TriZetto/Lytec/Gateway.  Put another way, Reynolds' analysis does not indicate that the insurance

10  companies improperly recorded claim information in the spreadsheets any more than it shows that

11  TriZetto/Lytec improperly recorded the information in their systems.

12      Moreover, neither Belcher nor Ganesh made an issue of the Lytec/Gateweay system at trial, even

13  though they could have.  Instead, the defendants attacked the Source Spreadsheets.  Nor did Belcher call

14  any witness from TriZetto, Lytec, or Gateway to testify at his sentencing, though he could have done so.

15          **D.      The Defendants' Motions Fail the Other Prongs Under Rule 33**

16      As discussed above, the defendants' motions are not "grounded on newly discovered evidence,"

17  Fed. R. Crim. P. 33(b)(1), and fail on that basis alone.  They are also not material and provide no basis

18  to believe that their inclusion at a new trial would result in an acquittal  But even if the defendants could

19  overcome those threshold requirements, the defendants cannot satisfy the remaining prongs of the five-

20  factor test:  the defendants were diligent in seeking the evidence and the evidence is not (a) cumulative

21  or (b) merely impeaching. *Brugnara*, 856 F.3d at 1206.

22      As to diligence (the second prong), the defendants have not explained why they did not (or could

23  not) have adduced the same purported new evidence regarding the Source Spreadsheets earlier.  Indeed,

24  the defendants received most of these spreadsheets approximately two years before trial, had an expert

25  retained to review them, and made the same challenges regarding purported inaccuracies of the Source

26  Spreadsheets when their attorneys cross-examined witnesses from insurance companies at trial.  They

27  also both identified Michael Arrigo as a consulting and testimonial expert in medical billing and an

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1    expert in Lytec/Gateway.  *See discussion below.*  No explanation is offered as to why his efforts could

2    not have found all of the purported post-trial "discoveries."  For the same reason, if the purportedly

3    "new" evidence came in at trial, it would be cumulative of other evidence and arguments the defendants

4    made, and there is no credible basis to believe that this information would result in an acquittal.  This is

5    based in part upon the fact that the defendants repeatedly asserted to the jury that the Source

6    Spreadsheets were inaccurate, and the jury rejected that argument in finding the defendants guilty.

7    **V.    Belcher's Claim of Ineffective Assistance of Counsel**

8        Belcher also argues that he received ineffective assistance of counsel at trial.  He specifically

9    asserts that his trial counsel was ineffective because it did not retain an expert to examine the

10   spreadsheets.  ECF No. 490 at pp. 24-26.  He claims this purported failure supports a motion under Rule

11   33.

12        The argument fails for two reasons.  First, it is factually false.  *See* ECF No. 117 (Belcher

13   disclosure of expert Michael Arrigo) *and compare* ECF No. 107 (Ganesh disclosure of Arrigo as

14   expert).  Indeed, contrary to Belcher's claims, he did previously retain an expert to review exactly the

15   same topics that he now asserts should have been reviewed by an expert.  *Compare* ECF No. 490 at p.

16   25 (itemized list of topics Belcher asserts he should have had an expert to consult with/opine on) *with*

17   ECF No. 170-1 (112 page report of Belcher expert Michael Arrigo) *and compare with* ECF No. 170

18   (motion to exclude Arrigo, including description of prior version of Arrigo report, which was longer

19   than the filed version).  The first draft of Arrigo's report, which was served by Belcher's attorneys, was

20   described by Belcher's attorney as reflecting an analysis of the Lytec and Gateway systems:

21         Our medical billing expert, Michael Arrigo, relied on information contained in three different
22         software - (1) eClinicalWorks, (2) Lytec, and (3) Gateway EDI.  It is my understanding that he
           performed searches and reviewed data available in these systems.  In my review of the discovery
23         the government has produced, I believe you already have access to eClinicalWorks and Lytec.
           We are in the process of trying to obtain alternate login credentials that would give you access to
24         the same information on Gateway.

25   Att. 5 (email from Belcher counsel on October 16, 2017 to government counsel, cc'ing Ganesh's

26   attorney).

27        In addition to being factually false, Belcher's argument is legally deficient.  Courts review the

28

1   strategic decisions of trial counsel with great deference.  Moreover, the Ninth Circuit has long rejected

2   Rule 33 motions that attempt to cast counsel's performance as newly discovered evidence.  *E.g., United*

3   *States v. Lara-Hernandez,* 588 F.2d 272, 275 (9th Cir. 1978); *see also United States v. Lara-Hernandez*,

4   588 F.2d 272, 275 (9th Cir. 1978); *United States v. Hanzeem*, 679 F.2d 770, 774 (9th Cir. 1982).  This

5   was a heavily litigated trial, and defendant's trial counsel made numerous efforts to impeach the

6   government's witnesses, call into question the accuracy of the government's evidence, and present

7   arguments in favor of Belcher's innocence.  The defendant would now like to second-guess those

8   strategic decisions, and, with 20-20 hindsight, declare those considerable efforts ineffective.  This is an

9   argument of convenience.  There was nothing ineffective about the quality of the trial defense in this

10  case, as demonstrated by the mixed verdict in this case.

11  **VI.    There was No *Brady* Violation**

12          Finally, the Court should reject Belcher's meritless and unsupported *Brady* claim.  He baselessly

13  claims the government knew of and withheld information regarding an investigation into an Anthem

14  employee that resulted in an indictment in the Central District of California that purportedly named a

15  number of other non-Anthem employees.  ECF 490 at 21.  Belcher does not specify which law

16  enforcement agency participated in the investigation.  He also does not explain why this information, if

17  accurate, qualifies  as exculpatory information (it is unclear why a lone employee at Anthem that

18  allegedly helped a handful of health care providers submit fraudulent claims is favorable and material to

19  Belcher).  And Belcher makes no effort to establish that the investigation team in the case at bar knew of

20  and withheld the information.

21          Under *Brady*, a defendant must establish for more than mere speculation about the prosecution's

22  knowledge of information and do more than speculate about whether such information may or may not

23  be exculpatory.  *See Brady v. Maryland*, 373 U.S. 83, 87-88 (1963).  A defendant's due process rights

24  are violated if a prosecutor "withholds evidence on demand of an accused which, if made available,

25  would tend to exculpate him or reduce the penalty."  *Id.*  The prosecutor must have suppressed or

26  withheld evidence that was both favorable and material to the defense.  *Moore v. Illinois,* 408 U.S. 786,

27  794 (1972).

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1    Belcher cannot meet these requirements.  There was no "suppression by the prosecution" here.

2    *Brady*, 373 U.S. at 87.  Indeed, Belcher has not shown that the government even knew about the

3    investigation of an Anthem employee being pursued in another federal district.  *See* ECF No. 490 at 24-

4    26.  Accordingly, there was no *Brady* violation.  *See, e.g.*, *United States v. Venegas-Reynoso*, 524 F.

5    App'x 373, 377 (9th Cir. 2013) ("There is no evidence suggesting that the prosecution, or any agents

6    involved in Reynoso's prosecution, had actual or constructive knowledge of the unrelated out-of-district

7    *Chavez* case at any time before Reynoso filed his new trial motion or that any agent involved in

8    Reynoso's prosecution—in the district of Arizona—was also involved in the *Chavez* case in the district

9    of Texas.").

10    Nor can Belcher satisfy *Brady*'s materiality requirement.  *See Wood v. Bartholomew*, 516 U.S. 1,

11    5-6 (1995) ("[E]vidence is 'material' under *Brady*, and the failure to disclose it justifies setting aside a

12    conviction, only where there exists a 'reasonable probability' that had the evidence been disclosed the

13    result at trial would have been different. . . . The information at issue here . . . is not 'evidence' at all.").

14    Allegations against one employee at a very large insurance company are just that—allegations.  And

15    allegations are not evidence.  Moreover, Belcher makes no attempt to explain how allegations made

16    against an employee at a large insurance could have any bearing on, or relate in any way to, the verdict

17    against Belcher, or how that information "would have produced a different verdict" in Belcher's case.

18    *Strickler v. Greene*, 527 U.S. 263, 281 (1999).  As discussed above, the evidence in support of the

19    verdict was overwhelming.  There is similarly no basis for an evidentiary hearing.[10]

20    **VII.    A Discovery Hearing is Not Warranted**

21    Belcher states, in a heading and briefly in his conclusion section, that he seeks post-trial

22    discovery to be ordered.  ECF No. 490 at 26.  Belcher does not address that request in his motion, and

23    therefore waived the request.  Even if not waived, Belcher cannot obtain post-trial discovery by

24    asserting baseless and speculative *Brady* theories.  As the Supreme Court has emphasized, "[t]here is no

25    general constitutional right to discovery in a criminal case, and *Brady* did not create one."  *Weatherford*

26    *v. Bursey*, 429 U.S. 545, 559 (1977).  And asserting a *Brady* claim does not grant a defendant license to

27

28
_____

[10]

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK

1   conduct a fishing expedition for *Brady* materials.  *See, e.g.*, *United States v. Weld*, No. 08-CR-83 PJH,

2   2009 WL 901871, at *2 (N.D. Cal. Apr. 1, 2009) (denying discovery motion because "defendants cannot use

3   *Brady* simply to search for *Brady* materials"); *United States v. Quinn,* 123 F.3d 1415, 1421 (11th Cir. 1997)

4   ("the *Brady* rule is not an evidentiary rule that grants broad discovery powers to a defendant"). As a result, a

5   post-trial discovery motion "based upon mere speculation as to whether the material would contain

6   exculpatory evidence" should be denied, because to rule otherwise "would convert *Brady* into a discovery

7   device and impose an undue burden upon the district court." *United States v. Arias-Izquierdo*, 449 F.3d 1168,

8   1189 (11th Cir. 2006).

9   **VIII.   Conclusion**

10          The defendants' motions should be denied.

11   DATED: August 17, 2018                    Respectfully submitted,

12                                             ALEX G. TSE
                                               United States Attorney
13
                                               /s/
14                                             _____
                                               JEFFREY NEDROW
15                                             PATRICK R. DELAHUNTY
                                               Assistant United States Attorneys

16

17

18

19

20

21

22

23

24

25

26

27

28

OPP. TO DEFENDANTS' MOTIONS TO SET ASIDE THE VERDICT
CASE NO. 16-CR-00211 LHK